[Civ. No. 11130. First Appellate District, Division One.—August 22, 1940.]

BLANCHE L. PORTER, as Executrix, etc., Respondent, v. THE EMPLOYERS' LIABILITY ASSURANCE CORPORATION, LIMITED (a Corporation), Appellant.

Redman, Alexander & Bacon and Herbert Chamberlin for Appellant.

A. B. Bianchi and Augustin Donovan for Respondent.

PETERS, P. J.—Plaintiff, May E. Walker, brought the present action against defendant, The Employers' Liability Assurance Corporation, Limited, to compel it to pay a judgment secured by plaintiff against Stella H. Adamson, the assured in an automobile public liability policy issued by defendant. The present action is a sequel to the case of *Walker* v. *Adamson,* 9 Cal. (2d) 287 [70 Pac. (2d) 914]. On that appeal the Supreme Court affirmed a judgment in favor of Dr. Walker and against Mrs. Adamson based upon injuries received by Dr. Walker while riding as a business guest in an automobile owned and being driven by Mrs. Adamson. The defendant insurance company defended that action and prosecuted the appeal therein under a written reservation of rights. In the present action the defendant seeks to avoid liability under its policy issued to Mrs. Adamson on the grounds that at the time of the accident the insured was operating the car in violation of the terms of the policy, and thereafter breached the cooperation clause of the policy. From a judgment in favor of plaintiff holding that the policy was in full force and effect defendant prosecutes this appeal.

The policy was entitled "Combination Automobile Policy". It provided that the automobile described therein was to be used for "Business and Pleasure", and expressly provided, "No automobile described herein is or will be rented to others or used to carry passengers for a consideration . . . except as follows: . . . No Exceptions." Another clause of the policy excluded liability when the automobile was being "used for renting or livery use or the carrying of passengers for a consideration".

It is the theory of the appellant that, at the time of the accident, Dr. Walker was in fact a passenger for a consideration within the meaning of the above clauses.

The facts as to the use of the car at the time of the accident are succinctly stated by the Supreme Court in the case of *Walker* v. *Adamson* (9 Cal. (2d) at p. 288) as follows: ''The plaintiff's injuries were sustained when the automobile driven by the defendant skidded on wet pavement while the parties were on a trip to Lake Tahoe. The undisputed evidence was that the plaintiff, Dr. May E. Walker, and the defendant, Stella H. Adamson, about the year 1925 became business associates. They acquired real property near Mt. Diablo. They also purchased real property at Lake Tahoe, the improvements on which were two main houses and guest cottages. These houses were rented in the summer-time, and the proceeds were divided equally. The expense of repairs and upkeep was also shared equally. The two made several trips together each year to the property to supervise construction, repair and opening of the houses for the rental season. Each owned an automobile. On these trips it was their custom to alternate the use of their cars. Concededly the trip in question, started on May 26, 1934, was for the purpose of taking hardware and other material to carpenters who were then engaged in constructing a guest cottage, also for the purpose of supervising construction and repairs and the renting of the property. Mrs. Adamson drove her own automobile.''

On the present trial these facts were elaborated upon, but the further evidence, in no essential, changed the basic situation described by the Supreme Court on the former appeal. On the present trial it developed that Dr. Walker and Mrs. Adamson had definite agreements governing their business relations, and that they kept formal records of their transactions. When Dr. Walker entered Mrs. Adamson's car on the trip in question, the evidence shows that Dr. Walker's obligation was to pay one-half of all expenses on the trip, including gas, oil, repairs, hotel, food and any other expenses incurred. Dr. Walker testified that she paid nothing at all for the ride as such, but simply paid one-half of the car's expenses, as well as all other expenses incurred on the trip, as part of her business arrangement with Mrs. Adamson.

On this state of facts the trial court found that at the time of the accident the car was being used for the business of the

assured, and that it was not then being used for the carrying of passengers for a consideration within the meaning of the policy. With this conclusion we agree.

On the prior appeal the main question presented was whether Dr. Walker was a "guest" within the meaning of the so-called "guest-law" of California (California Vehicle Code, sec. 403), or whether she was a person who had given "compensation" for the transportation within the meaning of that statute. The court held that the "parties were engaged on a business venture for their mutual advantage and that the plaintiff was therefore a person who had given compensation for the transportation and not a guest". (9 Cal. (2d) at p. 289.)

Appellant concedes that not every traveler who furnishes "compensation" within the meaning of the "guest-law" is necessarily a "passenger" for a "consideration" within the meaning of the clauses above-quoted. This concession was made necessary because of the Supreme Court's decision in *Western M. Co.* v. *Bankers I. Ins. Co.*, 10 Cal. (2d) 488 [75 Pac. (2d) 609]. In that case the policy provided that the insured car would not be "used to carry passengers for a consideration, actual or implied", and also permitted the car to be used for business or pleasure. At the time of the accident an employee of the insured was driving one Lawton from one town to another for the purpose of having Lawton inspect certain machinery the insured had offered to sell to Lawton's employer, and which, after the accident, was purchased by Lawton's employer. It was conceded that Lawton was not a guest, but, predicated on this admission, it was urged that he must be a passenger for a consideration. Citing many cases from other jurisdictions, the court held that the mere fact that the person involved was a passenger for a "compensation" within the meaning of the "guest-law", did not, *per se,* make the passenger one for a "consideration" within the meaning of the exclusion clause above-quoted.

The Western M. Co. case, *supra,* definitely settles the point that the term "compensation" used in the "guest-law" does not have the same meaning as the term "consideration" as used in insurance policies similar to the one here involved. It is true that, factually, that case differs from the instant one. In the Western M. Co. case, *supra,* no direct monetary return was received by the owner of the insured car for the transpor-

tation, while in the instant case the passenger was obligated to pay in money one-half of all expenses. However, in the Western M. Co. case the owner of the insured car obviously received a legal benefit for the transportation. For that reason, the theory of that case is applicable to the present one.

The courts in other jurisdictions have frequently considered the problem here involved. The cases are collected in two annotations in 95 A. L. R. 150, and 118 A. L. R. 393. No useful purpose would be served by reviewing the many authorities there discussed. Although it must be conceded that there is some slight conflict in the decisions, according to the overwhelming weight of authority, where a private automobile is used by the parties for their mutual interest, business, pleasure or benefit under an express or implied agreement to share expenses, it is held that the insured is not carrying passengers for a consideration within the meaning of such a clause. The main question presented in each case, under these authorities, is whether the payments made were in fact made for the use of the car. If not, the clause is inapplicable.

One of the cases cited with approval in the Western M. Co. case, *supra,* is *Ocean Accident & Guarantee Corporation* v. *Olson,* 87 Fed. (2d) 465. In that case three friends were returning to North Dakota after having visited California. Before leaving North Dakota they had agreed to contribute to a common fund for gasoline, oil and hotel expenses. The court held that, under such circumstances, nothing was being paid to the owner for the use of the car, and that the exclusion clause of the policy, similar to the one here involved, had no application. After emphasizing that the payments had no relation to payments for the use of the car, that they were not based on a mileage or time basis, that no compensation for wear or tear was included, and that the payments did not exceed actual expense, the court stated (87 Fed. (2d) at p. 467):

"The authorities, without dissent so far as we can find, hold that contribution by a person to the expense of a trip by automobile for the joint pleasure of the party, where the parties are friends or are related, is not 'consideration' or hire within the meaning of policy provisions such as those now before us. On the other hand, where the parties are strangers and the relation is a business one only, or the contribution is not related to the expense of the trip or exceeds the amount

of the expense, the arrangement constitutes a carrying 'for a consideration' within the meaning of such policies.''

There are many other cases adopting the same sound view. In *Beer* v. *Beer*, 134 Ohio St. 271 [16 N. E. (2d) 413, 118 A. L. R. 388], two sisters agreed with their brother that if he would furnish his car and drive the same to visit their father, who was ill, that they would pay all expenses. It was held that where the parties join in meeting the expenses of a trip made for their mutual interest, pleasure or benefit, the purpose of the owner is not the carrying of passengers for a consideration, and such clause is not applicable.

In *Park* v. *National Casualty Co.*, 222 Iowa, 861 [270 N. W. 23], it was held that where one member of an orchestra who owned a car carried the others from place to place pursuant to an agreement whereby each member paid the car owner a fixed sum per mile, but where such fixed sum was a mere approximation of the cost of operation and did not exceed the cost of operation, the members were not passengers for a consideration within the meaning of such a clause. In that case the court held that in determining the question not only the bare transaction, but also all of its surrounding circumstances, such as the status and relationships of the parties, the existence or lack of a common interest, pleasure or benefit in making the trip, and the relation of the amount paid to the actual cost of carrying, should all be considered.

In *Reed* v. *Bloom*, 15 Fed. Supp. 600, various friends rode to a convention together and on the way home insisted on making up a fund to pay for gasoline and oil. It was held that there was not a carrying of passengers for a consideration within the meaning of such a clause. Other cases, in addition to those already cited, where pursuant to an agreement or voluntarily without agreement, passengers who are friends or associates of the owner made up a common fund to pay the expenses of a trip in which all are interested, and, holding that such passengers are not being carried for a consideration, are: *Ocean Accident & Guarantee Corporation* v. *Meyers*, 22 Fed. Supp. 450; *United States Fidelity & Guaranty Co.* v. *Hearn*, 233 Ala. 31 [170 So. 59]; *Gardner* v. *Boyer's Estate*, 285 Mich. 80 [280 N. W. 117].

Appellant places its greatest reliance on two cases decided by the Circuit Court of Appeals for the Ninth Circuit, both purporting to interpret the California law. The first of these

is *Jensen* v. *Canadian Indemnity Co.*, 98 Fed. (2d) 469. In that case three men were appraisers for a national farm loan association. In riding about, they all traveled in one car. They agreed that for the use of the car a charge of five cents a mile should be made, this charge to be borne equally by the three, each passenger paying to the owner one and two-thirds cents a mile. It was held that while being so operated the car was being used to carry passengers for a consideration within the meaning of a clause similar to the one herein involved. *The court held that the case was not one where the owner was merely to be reimbursed for operating expenses,* nor where the compensation was paid as a voluntary contribution or as a mere social amenity, but was one where there was "a prior agreement to pay a fixed amount of money based upon the mileage traveled". (98 Fed. (2d) at p. 471.) It is obvious that, factually, the case differs from the one under consideration, and that the rule of law expressed therein has no application to a case where personal friends and business associates agree to split expenses on a trip for their mutual benefit. Whether the distinction made in the Jensen case between an agreement to reimburse for expenses and an agreement to pay a fixed sum per mile, where such sum was obviously an approximation of the cost of operation, is sound, we do not now have to decide. The case expressly recognized that an agreement to reimburse for expenses of operation did not violate such a clause. That is the situation in the instant case.

The other case upon which appellant places its main reliance is *State Compensation Ins. Fund* v. *Bankers Indem. Ins. Co.*, 106 Fed. (2d) 368. In that case one Dalton contracted with the county of Alameda to furnish the county a truck and driver seven hours a day for $1.50 per hour. The truck was to be used six hours a day to haul dirt, and the other hour to haul workmen to and from the job. While hauling workmen the driver was guilty of negligence resulting in injury to the men. It was held, and properly so, that the truck was clearly carrying passengers for a consideration at the time of the accident, even though that consideration was being paid by the county and not by the passengers or workmen. The court held there was a definite pecuniary benefit to Dalton derived from the carrying of the passengers and that such carriage was part of his legal obligations for which he re-

ceived compensation. Dalton was obviously carrying passengers for a specified consideration.

Neither case is persuasive in the present case. In the instant case Dr. Walker did not pay, or agree to pay, anything for the use of Mrs. Adamson's car. The case is simply one where the parties owned various properties in joint tenancy. They shared all expenses, profits and losses equally. They made frequent trips to view the premises, using but one car, sometimes Dr. Walker's and sometimes Mrs. Adamson's. They charged all expenses on such trips—food, gas, oil, repairs, equipment for the building, etc.—to the common venture. Obviously, compensation for the use of the car, or payment for transportation by one to the other, never was contemplated or provided for. No monetary consideration ever passed to the owner of the car for the use thereof. Considering the relationship of the parties, and the terms of their agreement, it must be held that there was no violation of the clauses in question.

Appellant's second main point is that it appears as a matter of law that there was a breach of the cooperation clause of the policy by the insured, and that, as a matter of law, prejudice must be presumed. The trial court found that there was no breach of the cooperation clause, and that appellant was not prejudiced by any act or omission on the part of the insured.

There are several recent cases in which the legal effect on the policy of lack of cooperation by the insured is discussed. (*Valladao* v. *Fireman's Fund Indem. Co.*, 13 Cal. (2d) 322 [89 Pac. (2d) 643] ; *Purefoy* v. *Pacific Automobile Indem. Exch.*, 5 Cal. (2d) 81 [53 Pac. (2d) 155] ; *Margellini* v. *Pacific Automobile Ins. Co.*, 33 Cal. App. (2d) 93 [91 Pac. (2d) 136] ; *Wright* v. *Farmers Automobile Inter-Insurance Exchange*, 39 Cal. App. (2d) 70 [102 Pac. (2d) 352].) For the purposes of this opinion, it is not necessary to determine whether the insurer must show prejudice resulting from the lack of cooperation, a question expressly left open in the Valladao and Purefoy cases, *supra*. In the present case, after reading the record, we are convinced that there was a clearcut conflict in the evidence on this issue.

What constitutes cooperation, or lack of it, on the part of the assured within the meaning of such clauses, is a question of fact, except where there is no dispute in the evi-

dence. (*Valladao* v. *Fireman's Fund Indem. Co., supra.*) Where, however, there is a conflict as to what was said by the insured, that conflict, like other conflicts, is determined by the findings of the lower court.

The following statement appearing in the Valladao case, *supra* (13 Cal. (2d) at p. 328), correctly states the law, subject only to the question of prejudice above-discussed:

"It may not be denied that aside from the obligation arising from the law of contract, a condition of a policy requiring the cooperation and assistance of the assured in opposing a claim or an action lodged against him by an injured person is material to the risk and of the utmost importance in a practical sense. Without such cooperation and assistance the insurer is severely handicapped and may in some instances be absolutely precluded from advancing any defense. Of course, as stated some years ago by Judge Cardozo, a cooperation clause may not be expanded to require the assured 'to combine with the insurer to present a sham defense'. (*Coleman* v. *New Amsterdam Cas. Co.,* 247 N. Y. 271 [160 N. E. 367, 72 A. L. R. 1443].) At the same time, however, it cannot be contracted to exclude a fair statement of the facts. The insurer is entitled to know from its assured the true facts (of which he may have knowledge) underlying an accident and upon which the injured person bases his claim in order that it may determine for itself, in the light of such information, whether it should contest or attempt to settle the claim. Our examination of many authorities indicates the general rule to be that under a cooperation clause the assured is required to give a fair and frank disclosure of information reasonably demanded by the insurer to enable it to determine whether there is a genuine defense. (*Coleman* v. *New Amsterdam Cas. Co., supra; Francis* v. *London G. & A. Co.,* 100 Vt. 425 [138 Atl. 780] ; *Seltzer* v. *Indemnity Ins. Co.,* 252 N. Y. 330 [169 N. E. 403] ; *Finkle* v. *Western Auto. Ins. Co.,* 224 Mo. App. 285 [26 S. W. (2d) 843].) Many other decisions to the same effect might be cited. In *Buffalo* v. *United States F. & G. Co.,* 84 Fed. (2d) 883, 885, it is stated: 'The company is entitled, however, to an honest statement by the insured of the pertinent circumstances surrounding the accident, as he remembers them. Lacking that, the company is deprived of the opportunity to negotiate a settlement, or to defend

upon the solid ground of fact. Nothing is more dangerous than a client who deliberately falsifies the facts.' ''

Appellant urges that the insured breached the cooperation clause by misrepresenting the facts of the accident; that the account of the accident as given by the assured prior to trial of *Walker* v. *Adamson* indicated that there was a good defense to plaintiff's cause of action, whereas upon the trial, it is urged, the insured changed her story to virtually concede her liability. It is contended that prior to the trial in *Walker* v. *Adamson,* the insured gave the insurance company various statements concerning the condition of the automobile tires at the time of the accident, the condition of the road, the speed of the automobile, and as to the time she left Piedmont which led the company to believe a good defense to the action existed. It is urged that at the trial the insured testified differently from these statements and practically admitted liability.

Several of these contentions are predicated upon statements given to an adjuster for appellant, Ted D. Brown, by Dr. Walker and Mrs. Adamson at the hospital several days after the accident on May 28th, and on May 31, 1934. The two women were then occupying the same hospital room, and both were still suffering from the effects of the accident which had occurred on May 26th. The adjuster testified that he made a memorandum of what Mrs. Adamson told him on that day. This memorandum was unsigned. He also stated both women were complaining about their injuries, so he left and returned three days later. At that time he prepared a statement from what he says Mrs. Adamson told him, and had Dr. Walker sign it. Again, on August 13, 1934, another adjuster, Ben F. Rice, visited Mrs. Adamson and prepared a statement from what he testified she told him. This statement Mrs. Adamson signed. There can be no doubt that the statements appearing in the unsigned memorandum of May 28, 1934, in the statement of May 31, 1934, and in the signed statement of Mrs. Adamson on August 13, 1934, differ materially from the testimony of Mrs. Adamson given on the trial of *Walker* v. *Adamson*. Both adjusters testified on the present trial that Mrs. Adamson did not tell them that the cause of the accident was that the rear tires of the automobile were worn smooth. In the August 13, 1934, memorandum appears the statement that the tires were in good condition and that the

rear tires had a good tread on them. It also appears that the day after the accident an employee of Mrs. Adamson, a Mr. Brasfield, examined the wrecked automobile and reported to her that the tires were smooth. The adjusters testified that this inspection and report were not reported to them. On the trial Mrs. Adamson testified that she knew the tires were smooth but in spite of inclement weather determined to take a chance. On the present trial Mrs. Adamson denied making the statement appearing in the signed memorandum. She testified that on May 28, 1934, she had a badly gashed head, was bruised, ill and badly shaken, but that she, nevertheless, gave adjuster Brown a full statement of the accident and that she told him about Brasfield, and told him where the wrecked car had been taken. She further testified that she never made the statement appearing in the August 13, 1934, memorandum concerning the tires; that she told Rice about Brasfield and told him the tires were "good enough for a dry trip, dry weather", but did not tell him the treads were good. Dr. Walker, who was in the room when the Adamson statements were given to Brown on May 28th and May 31, 1934, testified that Mrs. Adamson told Brown all about Brasfield and all about the worn tires, and that she, Dr. Walker, told representatives of the insurance company all about the worn tires in August of 1934. Mrs. Adamson testified that when she signed the statement of August 13, 1934, in which appeared the tire statement, she was nervous and did not read it carefully. Obviously, on this issue of whether there was a full, fair, and honest disclosure of the true facts by the insured there was a clear-cut conflict in the evidence. This conflict was resolved against appellant by the trial court, and cannot be disturbed on appeal. (See annotation in 98 A. L. R. 1465, at p. 1468.)

■ Certainly, it cannot be urged seriously that Mrs. Adamson is responsible for the carelessness of the adjusters in failing to record her statements properly. Nor can it be contended that by signing statements without reading them, in which statements the adjusters carelessly or by design misrepresented what had been told them, that the insured was guilty of lack of cooperation as a matter of law. She was not dealing with these adjusters at arm's length. As agents of her insurance company she was entitled to believe that they

would prepare a proper and correct memorandum of her statements.

The same situation exists as to the other alleged misrepresentations. As to the condition of the road, in the signed statement of Dr. Walker of May 31st, composed by adjuster Brown from information given by Mrs. Adamson, appears the statement that mud had been washed from the higher side of the road to the lower, and that this made the roadway slippery. On the trial of *Walker* v. *Adamson* the insured denied that the accident was caused by the unexpected presence of mud in the highway. It is rather significant that in Mrs. Adamson's unsigned statement of May 28th, and in her signed statement of August 13th, there is no mention of mud. Both Mrs. Adamson and Dr. Walker denied that the statement appearing in the Dr. Walker memorandum had been made by Mrs. Adamson. They explained that they had told adjuster Brown that the doctors at the hospital had told them that accidents had occurred at the same spot caused by milk trucks tracking mud on the highway. Clearly, the evidence is in conflict as to whether any such misrepresentation was made.

The same situation exists as to time and speed. In the signed statement of Dr. Walker it is stated that they left Piedmont "about 4:30 A. M." on the morning of the accident, and that at the time of the accident Mrs. Adamson was driving within the speed limit of forty-five miles per hour. In Mrs. Adamson's statement of August 13th it is stated that "May 26-1934 around 4 or 4:30 A. M. Dr. Walker came over to my place and after eating breakfast it was around 4:30 or 4:45 a. m. and we left Oakland". It was also stated therein that after leaving Fairfield (the accident occurred near Dixon) she drove "about 25 or 30 miles an hour". The significance of the time the parties left home is that the accident occurred about eighty miles from Piedmont at about 7 A. M. On the trial the insured testified that on the morning of the accident she had awakened at 4:30 A. M.; that she packed a few things; that they started from Piedmont at "almost about five"; that around Vacaville, because it was raining and foggy, she slowed down to "maybe 25 or 30"; that at the time of the accident she had speeded up to "maybe 30 or 35 . . . Well, maybe 35 miles an hour"; but that it "might be near 40"; that she was not traveling fifty miles per hour. On cross-examination she disclosed that, after leav-

ing Piedmont a little before five, they drove to a restaurant in Oakland and had some breakfast and that they left Oakland at about 5:30 A. M. Dr. Walker testified that the car was going "about 50 miles or more, an hour" at the time of the accident; that this impression was partially based on computing the distance covered after leaving Oakland, and on the violence of the impact. Obviously, the statements made to the adjusters by the insured as to the times the parties left Piedmont and Oakland are ambiguous. Dr. Walker and Mrs. Adamson both testified that Mrs. Adamson fully and fairly answered every question the adjusters asked her. The adjuster may well have been confused as to whether the leaving time stated to him applied to Piedmont or to Oakland. As to speed, there is no material variance between Mrs. Adamson's statements to the adjuster and those made at the trial. Clearly, there is no evidence that the insured wilfully made any false statements, or that she did not act in good faith or that she did not make a full, fair and complete disclosure, in any material respect, to the insurance company. The accident occurred in May, 1934. Statements were taken while the two women were in a highly nervous and upset condition. No copies were given to them. Subsequently, in August, a statement was taken from Mrs. Adamson. The cause proceeded to trial in June of 1935. ■ Certainly an insured cannot be charged with lack of cooperation simply because of minor variances in her various statements. It would be most startling indeed if such variances did not occur. Moreover, unintentional and accidental mistakes in statements made by the insured do not violate the cooperation clause. (See cases 72 A. L. R. 1464; 98 A. L. R. 1473.)

■ Appellant next urges that Mrs. Adamson violated the policy provisions in that she voluntarily assumed liability for the accident. The policy contained a provision that: "The Assured shall not voluntarily assume any liability, settle any claim or incur any expense, except at the Assured's own cost . . . without the consent of the Corporation previously given in writing . . . ". In this connection appellant relies partly on Dr. Walker's testimony given on the trial of the accident case that Mrs. Adamson admitted to her "many times" that she was at fault and to blame for the accident. She went on to explain that they had talked a great deal about the accident and that Mrs. Adamson acknowledged at

all times "that her tires were smooth, and she knew that her tires were smooth, and that she was going too fast for the condition of the tires and the road and the weather." According to Dr. Walker, Mrs. Adamson told her also that she was heavily insured and that she "would see that my injuries were taken care of, and my loss of time provided". Mrs. Adamson testified at that trial she had told Dr. Walker she was insured, and "that she would be taken care of".

Appellant urges that such action constituted a voluntary assumption of liability on Mrs. Adamson's part in violation of the policy provision above-quoted. In its opening brief appellant cites cases indicating that such statements are properly admissible as declarations against interest or admissions. Those cases are not in point on the question of the interpretation of the policy. In its closing brief appellant cites *Kindervater* v. *Motorists Casualty Ins. Co.*, 120 N. J. L. 373 [199 Atl. 606], as supporting its contention. In that case the insured signed a written statement which he delivered to the injured parties in which he stated: "I admit liability in the above mentioned accident". That is far different from the situation here involved. Certainly it cannot be held that under such a clause the insured is prohibited on pain of violating the policy from giving the injured person a truthful explanation of the accident and the circumstances thereof, or from telling the injured person of the existence of insurance. (Cases are collected and discussed in an annotation in 72 A. L. R. 1446, at p. 1477, et seq.) If the clause were so construed it would be violative of public policy. In the instant case the trial court found that the assured did not voluntarily, or at all, assume any liability. Clearly, that finding is supported and cannot be disturbed on appeal.

The other contentions of appellant concerning the admission of evidence are so minor as not to require consideration. Even if such evidence was improperly admitted, which we do not decide, it would not cause a reversal under article VI, section 4½ of the Constitution.

The judgment appealed from is affirmed.

Knight, J., and Ward, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on September 21, 1940.