[L. A. No. 14415. In Bank.—March 27, 1934.]

SECURITY TRUST & SAVINGS BANK OF SAN DIEGO (a Corporation), Respondent, v. NEW YORK IN-DEMNITY COMPANY (a Corporation), Appellant.

Mathes & Sheppard, W. C. Mathes, Lloyd Melvin Smith and J. Stanley Mullin for Appellant.

O'Melveny, Tuller & Myers, Louis W. Myers, C. P. Von Herzen, Joe Crider, Jr., and Clarence B. Runkle as *Amici Curiae* on Behalf of Appellant.

Hamilton, Lindley & Higgins for Respondent.

WASTE, C. J.—Defendant appeals from a money judgment entered in favor of plaintiff.

The cause went to trial on an agreed statement of facts which may be summarized as follows: At all times material to this action Gordon L. Eby and Lewis H. Homer were attorneys-in-fact for the Indemnity Insurance Company of North America, which for brevity we will refer to as the Indemnity Company, and each was authorized to execute, acknowledge and deliver in the name of the company, indemnity and fidelity bonds and undertakings, including those similar to the one here involved. Homer had offices with and was employed by Eby. He acted as solicitor and salesman for the Indemnity Company and inspected and supervised the work of contractors for whom the Indemnity Company had written indemnity or fidelity bonds and represented the Indemnity Company in cases where such contractors had failed or were about to fail or had abandoned the performance of their contracts. These facts were all known to the plaintiff bank and its officers.

P. C. Kelley was a vice-president of the plaintiff bank and was authorized to and did act for it in all the transactions involved in this action. R. W. Forsyth was the Pacific Coast manager of the Indemnity Company. Blanche P. Matson was a notary public in and for San Diego County and was employed in the office of Eby up to about November 17, 1928, on which date her employment terminated. Plaintiff and its officers knew she was a notary public and that she was employed in the office of Eby, but had no knowledge of the termination of her employment until after March 4, 1929.

On or about December 24, 1928, Homer represented to Kelley that a contractor named R. T. Dawson had obtained two public improvement contracts, one known as the Sweetwater bridge contract and the other as the Dulzura conduit contract, with the Indemnity Company as surety on his labor, material and completion bonds; that Dawson was

unable to complete the contracts and that the Indemnity Company would be compelled to take over and complete them at a cost to it of $15,000; that the completion would require about six months; that the Indemnity Company had instructed Homer to take charge of the completion work and to borrow money in his own name from the plaintiff to complete the contracts; that the Indemnity Company would guarantee the repayment of the loan by giving a bond in the penal sum of $16,500. Homer gave Kelley an unexecuted bond which would serve as the form of the bond to be executed to secure this loan. This application for a loan was referred to the loan committee of the plaintiff bank. Kelley reported the representations made to him by Homer and gave the committee the blank form of bond. While the application was under consideration by the loan committee, and for the purpose of inducing it to approve the loan, Homer presented to plaintiff the following letter:

"Gordon L. Eby & Co.,

"Gentlemen:

"Re: Robert T. Dawson
S. A. 15148 Sweetwater Bridge.
S. A. 14195 Dulzura Conduit.

"Your wire received. You are hereby authorized to sign Indemnity Bond $16500.00 favor of Security Trust & Savings Bank of San Diego securing note of Lewis H. Homer issued for six months.

"Very truly yours,
"R. W. Forsyth.
"R. W. Forsyth.
"RWF/AM                                    Manager."

Homer represented to the officers of the plaintiff bank that the foregoing letter was genuine and bore the genuine signature of R. W. Forsyth. The loan committee and officers of plaintiff bank believed Homer's representations and authorized the making of the proposed loan, which was to be evidenced by the promissory note of Homer, due in six months and secured by the written guarantee of the Indemnity Company.

Thereafter and on or about December 27, 1928, Homer executed and delivered to plaintiff the required promissory note in the principal sum of $15,000 and the written guarantee purporting to have been executed by the Indemnity

Company and having attached to it the signature of the Indemnity Company by Gordon L. Eby, its attorney-in-fact. This guarantee bore the acknowledgment of Eby before Blanche P. Matson, a notary public. Homer represented that the guarantee bore the genuine signature of Eby and was in fact duly acknowledged by him. Plaintiff and its officers did not question the truth of these representations, made the loan upon the security mentioned, and placed $15,000 to the credit of Lewis H. Homer in a checking account subject to his check. All of this money was withdrawn by checks signed by Homer prior to March 1, 1929, except the sum of $28.49. Homer disappeared on this last date and has not been apprehended.

It is stipulated that plaintiff would not have advanced the money to Homer had it not believed all the representations made by him and that the letter and guarantee were the genuine acts of Forsyth and the Indemnity Company.

All the representations made by Homer were false and fraudulent except that there was a contractor named R. T. Dawson who had two contracts for public improvements which we have mentioned; that the Indemnity Company had written a labor, material and completion bond for him, and that the signature and seal of Blanche P. Matson on the certificate of acknowledgment were genuine. The signature of Forsyth on the letter was forged, as was the signature "Indemnity Company of North America by Gordon L. Eby, attorney in fact" on the guarantee. The signature of Blanche P. Matson on the certificate of acknowledgment was her genuine signature. It had been attached to the certificate in blank before it was attached to the indemnity guarantee bond. It was her custom to sign acknowledgment certificates in blank for convenience. These were left in her desk in the office of Eby. The certificate of acknowledgment was filled out by Homer or some other person without her knowledge or consent and the notarial seal attached after she left Eby's office was attached to the guarantee bond by Homer before its delivery to the plaintiff. (*Security Trust & Sav. Bank* v. *Matson*, 116 Cal. App. 616 [2 Pac. (2d) 1001].) Neither Forsyth, Eby nor the Indemnity Company had any knowledge of the execution and delivery of the forged letter or of the forged guarantee bond, and neither plaintiff nor its officers had any knowledge of these

forgeries or of the falseness of the representations made by Homer until after March 1, 1929.

Upon ascertaining the facts the plaintiff bank made written demand upon the defendant New York Indemnity Company for the loss sustained as a result of the loan to Homer, and accompanied the demand with an affidavit purporting to comprise a proof of loss under the terms and provisions of a "Banker's Blanket Bond" theretofore issued by the defendant to the plaintiff upon payment of the premium therefor. The defendant denied any liability for the loss and this action followed. As already indicated, the trial court gave judgment for the plaintiff. The sole question presented is whether the loss to the plaintiff bank, as a result of the transaction with Homer, is such a loss as the defendant Indemnity Company insured against by the terms of its "Banker's Blanket Bond".

The pertinent coverage provisions of the bond are:

"The losses covered by this bond are as follows: . . .

"(B) Any loss of Property through robbery, larceny (whether common-law or statutory), burglary, theft . . . while the Property is within any of the Insured's offices covered hereunder, . . .

"The foregoing agreement is subject to the following conditions and limitations: . . .

"Section 2. This bond does not cover:

"(a) Any loss effected directly or indirectly by means of forgery, except when covered by Insuring Clause (A) or (D) hereof. [It is conceded that insuring clauses "A" and "D" are without application to this case.] . . .

"(d) Any loss resulting from any loan made by the Insured . . ."

It must be admitted that Homer's conduct in obtaining the loan from the plaintiff bank and in absconding with the money so obtained constituted theft as it is now defined in section 484 of the Penal Code. Every element of the offense is presented in the facts stipulated to by the parties.

This being so, and had the bond contained only the insuring clause "B", without exception or limitation, the loss suffered by plaintiff would fall squarely within its coverage provisions and the judgment would have to be affirmed. However, the several coverage clauses are, in the

terms of the bond, "subject to the following conditions and limitations", viz., that the bond does not cover (a) any loss effected directly or indirectly by means of forgery, or (d) any loss resulting from any loan made by the insured. A mere reading of the stipulated facts, summarized above, very clearly indicates to us, and the trial court so found, that the loss suffered by the plaintiff bank was effected, indirectly at least, by means of forgery. This, of course, serves to exclude such loss from coverage under the policy because of the exception and limitation contained in section 2a, above quoted. The loss suffered in the Homer transaction would also appear to be excluded from coverage under the policy because of the provisions of section 2d, *supra,* which exclude any loss resulting from a "loan". For either or both of these reasons the judgment must be reversed.

■ In opposition to this conclusion and in support of the judgment, the plaintiff contends that the court below was correct in determining an inconsistency existed in the coverage clauses of the policy which, under settled principles, should be resolved in favor of the insured. While we readily recognize and approve the principle that ambiguities and inconsistencies should be resolved against the insurer and in favor of the insured, we fail to see its application to the bond under consideration. We are unable to subscribe to the reasoning which suggests that because the general coverage clause "B" insures against all thefts, the exception or limitation clauses excluding losses resulting from forgery or growing out of a loan, must be so construed as to exclude such losses only when there is an absence of the elements of theft. To so interpret the bond would be novel, to say the least, and would serve to nullify the exception or limitation clauses in important particulars. The very purpose of exception or limitation clauses is to exclude risks otherwise covered by general coverage clauses. It is of their nature to conflict with general clauses in that they constitute restrictions on the latter. An insurance contract, like any other contract, should be construed as an entirety, the intention being gathered from the whole instrument. (*Burr* v. *Western States L. Ins. Co.,* 211 Cal. 568, 576 [296 Pac. 273].)

The unquestionable purport of section 2a is that the bond does not cover "*any* loss effected directly or indirectly by means of forgery", unless such loss falls within the purview of the general covering clauses "A" or "D", which latter clauses, as stated above, are not pertinent to the present inquiry. If all losses effected by means of forgery, except losses covered by clauses "A" and "D", are excluded from coverage under the bond, it goes without saying that losses otherwise covered by the general clauses "B" and "C" are excluded when effected directly or indirectly by means of forgery. What has been said applies equally to losses resulting from loans. (Sec. 2d, *supra.*)

This construction of the bond comports with the provisions of section 2628 of the Civil Code wherein it is declared that "Where a peril is specially excepted in a contract of insurance, a loss, which would not have occurred but for such peril, is thereby excepted; although the immediate cause of the loss was a peril which was not excepted."

We find additional support for our conclusion in two New York decisions wherein the identical question was presented for adjudication. (*Trade Bank of N. Y.* v. *United States F. & G. Co.*, 249 N. Y. 546 [164 N. E. 578]; *World Exch. Bank* v. *Commercial Cas. Ins. Co.*, 255 N. Y. 1 [173 N. E. 902, 904].) In each of these cases the New York court was called upon to interpret a "Banker's Blanket Bond", such as we have here before us, and more particularly to determine the identical question here involved, viz., whether losses resulting from theft, and otherwise covered by the general insuring clause "B", are excluded from coverage because of the particular provisions of section 2a excluding any loss effected directly or indirectly by means of forgery. In each of the cited cases the loss was held, as herein concluded, not to be covered by the bond. The following appears in the latter case: "Subdivision B gives indemnity for any loss 'through robbery, . . . theft, . . . while the property is actually within the offices of the insured'. This clause might apply to the loss suffered by the plaintiff if it were not for a subsequent exception. By subdivision 2 (a), the 'bond does not cover any loss effected by means of forgery, except when covered by insuring clauses A and D'. The loss in question was one effected by means of forgery . . . and, unless covered

by A or D, must be held to be excluded.'' This construction of the provisions of the bond coincides with our interpretation thereof.

Inasmuch as this cause was submitted to the court below upon an agreed statement of fact, and there is therefore no necessity for a second trial, the judgment is reversed with directions to the trial court to make new findings of fact and conclusions of law in accordance with the views herein expressed and to enter judgment thereon for the defendant.

Curtis, J., Langdon, J., Preston, J., Shenk, J., and Thompson, J., concurred.

Rehearing denied.